UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
GLORIA SANDRINO,                    :
                                    :
         Plaintiff,                 :
                                    :
                                    :        10 Civ. 7897(BSJ)
              v.                    :        **Memorandum and Order**
                                    :
MICHAELSON ASSOCIATES, LLC.         :
and CATHERINE MICHAELSON            :
                                    :
         Defendants,                :
                                    :
------------------------------------x
                                    :
MICHAELSON ASSOCIATES, LLC,         :
                                    :
         Counterclaim Plaintiff,    :
                                    :
              v.                    :
                                    :
GLORIA SANDRINO,                    :
                                    :
         Counterclaim Defendant,    :
                                    :
-and-                               :
                                    :
LUCAS GROUP, MERLE VAUGHN,          :
and C. THOMAS WILLIAMSON III,       :
                                    :
         Additional Counterclaim    :
         Defendants.                :
                                    :
------------------------------------x

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

    On October 20, 2010, Plaintiff Gloria Sandrino ("Sandrino")

filed under seal the Complaint in the instant action.  On

November 18, 2010, Defendants Michaelson Associates, LLC ("MA")

and Catherine S. Michaelson ("Michaelson") (collectively the

1

"Michaelson Defendants") filed an Answer and Counterclaim.  On May 4, 2011, the Michaelson Defendants amended their Answer and Counterclaim to include Additional Counterclaim Defendants, Lucas Group, Merle Vaughn ("Vaughn"), and C. Thomas Williamson III ("Williamson") (collectively the "Lucas Counterclaim Defendants").  On October 21, 2011, the Michaelson Defendants and the Lucas Counterclaim Defendants each filed under seal motions for summary judgment.  On October 25, 2011, Sandrino filed under seal a motion for summary judgment of her own.

Since all three of the summary judgment motions pending before the Court involve the same operative facts and related questions of law, the Court now addresses all three motions.

BACKGROUND

I.   <u>Agreement Between Sandrino and MA</u>

MA is a recruiting firm established in 1982 with a single office in New York City.  (Michaelson Parties' Resp. to Gloria Sandrino's Statement of Uncontested Material Facts Pursuant to Local Civil Rule 56.1 ("Resp. to Sandrino Stmt. of Facts") ¶ 1.) Michaelson is and always has been the sole owner of MA.  <u>Id.</u> at ¶ 2.  MA specializes in securing employment opportunities for lawyers in law firms primarily located in New York City, and, to a lesser extent, the Northeast coast.  <u>Id.</u> at ¶ 1.

2

In April 2008, Sandrino was engaged as a recruiter by MA. Id. at ¶ 1.  Prior to her engagement with MA, Sandrino had no legal recruiting experience.  (Reply to Sandrino's Response to the Michaelson Parties' Statement of Material Facts as to which there is No Dispute to Be Tried ("Defs. Reply Stmt. of Facts") ¶ 4.)

On September 16, 2008, Sandrino and MA entered into a valid and binding contract, the Amended Contractor and Non-Disclosure Agreement (the "Agreement").  (Resp. to Sandrino Stmt. of Facts ¶ 4.)  The Agreement does not contain a non-compete provision. Id. at ¶ 11.  The Agreement states in relevant part, however, that the parties agree that:

> 2.4  The Company [MA] shall pay to the Contractor [Sandrino] commission compensation ("Commissions") as follows:
> - Fifty percent (50%) of the revenue received by the Company in connection with the placement of a Candidate with a client of the Company ("Client"), less any accumulated draws to date that have not previously been deducted from a Commission. Commissions shall be due, however, only for Contractor's placements made during the Term.[1]
> - If the Term is still ongoing, or Contractor is otherwise employed by the Company, Commissions shall become due and owing, and shall be paid, in the pay period[2] immediately after such revenue is actually received by the Company.

---

[1] The Agreement defines "Term" as: "The Contractor's engagement by the Company, which commenced on March 31, 2008 shall continue at-will, meaning that either party is free to terminate it, with or without cause.  The period of this engagement shall be known as the 'Term.'"  (Decl. of Tai H. Park in Supp. of Defs.' And Countercl. Pls.' Mot. for Sum. J. Dismissing the Compl. and for Partial Sum. J. Against Sandrino ("Park Decl."), Ex. 5, ¶ 1.)

[2] The Agreement does not define the term "pay period."

- If the Term is not still ongoing, and the Contractor is not otherwise employed by the Company, these Commissions shall become due and owing, and shall be paid, only in accordance with the terms of Section 5 below.

(Decl. of Tai H. Park in Supp. of Defs.' And Countercl. Pls.' Mot. for Sum. J. Dismissing the Compl. and for Partial Sum. J. Against Sandrino ("Park Decl."), Ex. 5, ¶ 2.4.)

The Agreement further states in relevant part under Section 5, which is entitled "Subsequent Commissions," that:

If Contractor's engagement is terminated by either party; and Contractor is not otherwise employed by the Company, any Commissions potentially due under this Agreement shall become due and owing, and shall be paid, only after (i) the Candidate's guarantee period with the Client has expired, or (ii) six months after the Candidate is still employed by the Client, whichever is later, and in either instance only if the Candidate is still employed by the Client, to the Client's satisfaction, at the end of that period. Contractor shall not be entitled to a Commission if the Candidate fails to complete the guarantee period to the Client's satisfaction.  Upon the termination of Contractor's engagement and employment by the Company, Contractor shall execute an Affidavit in the form annexed as Exhibit A.  The execution of this document is an agreed upon prerequisite to the post-termination payment of any Commissions to Contractor.

Id. at ¶ 5.

Exhibit A, which is attached to the Agreement, states that the affiant, "being duly sworn, deposes and says under penalty of perjury," that:

I have never taken, or removed from, Michaelson Associates (the "Company"), any confidential and proprietary information, documents, records or other non-public

4

> information of any type whatsoever concerning or relating
> to the business and affairs of the Company which I may have
> acquired in the course of my engagement...

Id. at 5.  Following a statement that "[t]he confidential and

proprietary information covered by these representations and

this promise includes, but is not limited to," Exhibit A goes on

to list several categories of documents including "Copies of

resumes of any Candidates" and "Any lists generated by the

database WinSearch."  Id. at 5-6.

In addition to the foregoing, the Agreement also states in

paragraph 4.1 that:

> Confidential and Proprietary Information.  During and after
> her engagement by the Company, Contractor covenants and
> agrees that she will not disclose to anyone without the
> Company's prior written consent, any confidential
> materials, documents, records or other non-public
> information of any type whatsoever including but not
> limited to those items set forth in Exhibit A, concerning
> or relating to the business or affairs of the Company,
> which Contractor may have acquired in the course of her
> engagement.  Upon termination of the engagement, Contractor
> shall return any and all such confidential and proprietary
> information to the Company and shall execute an Affidavit
> in the form annexed as Exhibit A.

Id. at ¶ 4.1.  This section is then followed by Section 4.2,

which is entitled "Rights and Remedies upon Breach," and states

that:

> If Contractor violates any of the provisions outlined in
> this Section 4, Contractor and Company agree that Company
> is entitled (i) to all relief available under law,
> including injunctive relief without the necessity of
> posting a bond and, if it prevails, recovery of its
> attorneys' fees and (ii) to recover all sums of money
> derived by Contractor from her activities in violation of

5

this agreement, including, but not limited to, all
compensation obtained by Contractor as a result of her
activities in violation of this Agreement.

Id. at ¶ 4.2.

## II.  The John Doe 1 Placement

On or about November 30, 2009, Michaelson informed Sandrino

that John Doe 1 ("Doe 1"),[3] a senior government prosecutor, was

actively considering seeking employment at a large firm.  (Defs.

Reply Stmt. of Facts ¶ 38.)  Michaelson asked Sandrino to

contact Doe 1 and to contact the law firm, Law Firm A,[4] regarding

Doe 1.  Id. at ¶¶ 38-39.  Sandrino then went on to work as the

primary MA recruiter with respect to placing Doe 1.  (Resp. to

Sandrino Stmt. of Facts ¶ 13 Response.)

In late March 2010, after more than a month of work by

Sandrino, Doe 1 was successfully placed as a partner at Law Firm

A.  Id.

## III.  Sandrino Begins Communications with the Lucas Group

At the same time that Sandrino and MA were awaiting the

finalization of the Doe 1 placement, on March 1, 2010, Vaughn

contacted Sandrino.  (Defs. Reply Stmt. of Facts ¶ 55.)  Vaughn

is the managing partner for legal recruiting of the Lucas Group

---

[3] The publicly filed documents refer to several non-parties to this action by
pseudonyms.  The names associated with the pseudonyms are identified in the
Michaelson Defendants' summary judgment motion which was filed under seal.
The Court adopts the same pseudonyms in this order.  See (Memorandum of Law
in Supp. of Defs.and Countercl. Pl.'s Mot. for Summ. J. Dismissing the Compl.
and for Partial Sum. J. Against Sandrino ("Defs. Summ. J. Mem.") 5, n. 2.)

[4] See id.

in Los Angeles.  (Michaelson Parties' Response to Lucas Parties'
Statement of Material Facts on Mot. for Summ. J. as to which
There Is No Genuine Issue to Be Tried ("Resp. to Lucas Stmt. of
Facts") ¶ 5.)  The Lucas Group is a very large national
recruiting firm located in a number of different states with
substantial legal recruiting operations in California, New York,
and Washington, D.C.  Id. ¶ 3.  On March 24, 2010, Sandrino
suggested to Vaughn that the two might be able to work together.
(Defs. Reply Stmt. of Facts ¶ 56.)  Sandrino subsequently began
employment discussions with the Lucas Group.  Id. at ¶ 57.
These discussions involved Sandrino, Vaughn, and Williamson, the
Lucas Group's head of legal recruiting.  Id.

    Although the Michaelson Defendants and the Lucas
Counterclaim Defendants do not dispute that Sandrino and
employees of the Lucas Group corresponded in the spring of 2010,
the parties dispute what Sandrino communicated to the Lucas
Group during that time.  Relying on Vaughn's deposition
testimony, the Lucas Counterclaim Defendants maintain that
Sandrino told Vaughn that her arrangement with MA allowed for
her to work with other recruiting firms.  (Resp. to Lucas Stmt.
of Facts ¶ 44.)  The Lucas Counterclaim Defendants also maintain
that, in the spring of 2010, both Vaughn and Williamson were
unaware of: (1) whether Sandrino had a written agreement with
MA; (2) what the terms were of any agreement between Sandrino

and MA; and (3) any confidentiality restrictions that would have
prohibited Sandrino from simultaneously working for Lucas Group
and MA.  Id. at ¶¶ 44-54.  In contrast, citing contemporaneous
e-mail correspondence between Sandrino, Vaughn, and Williamson,
the Michaelson Defendants counter that both Vaughn and
Williamson were well aware that the terms of Sandrino's
agreement with MA restricted her level of cooperation with Lucas
Group.  Id.

## IV.   Sandrino's Recruiting Activity from April through June 2010

Setting aside the nature of the communications between
Sandrino and Lucas Group during the spring of 2010, the parties
do not dispute that from late March 2010 to June 24, 2010, when
Sandrino executed a Non Disclosure and Non-Competition
Disclosure Statement (the "Lucas Group Agreement") with Lucas
Group, Sandrino was engaged with MA pursuant to the Agreement.
Sandrino's recruiting activities for the period of time that she
was both subject to the Agreement and in communications with
Lucas Group are central to the dispute between the parties.
These activities include: (1) informing the Lucas Group of an
opportunity at Law Firm C[5]; (2) referring John Doe 8[6] to the
Lucas Group; and (3) disclosing to the Lucas Group, through

---

[5] See (Defs. Summ. J. Mem. 10, n. 4.)

[6] See id. at 10, 1. 6.

various e-mails and communications, numerous candidates who were never successfully placed.

### A. Law Firm C Opportunity

On March 23, 2010, Michaelson informed Sandrino about a placement opportunity with Law Firm C. (Defs. Reply Stmt. of Facts ¶ 61.) After her communication with Michaelson, on April 9, 2010, Sandrino informed Vaughn that Law Firm C was "desperately looking for an Anti-trust partner." Id. at ¶ 60; and (Resp. to Lucas Stmt. of Facts ¶ 88.)

At the time that Sandrino alerted Vaughn as to the opportunity with Law Firm C, Williamson had a candidate, John Doe 10,[7] who he had known for years, had recruited previously, and was working with Vaughn to place. (Resp. to Lucas Stmt. of Facts ¶ 91.) On June 8, 2010, Vaughn submitted John Doe 10 to Law Firm C. Id. at ¶ 95. Two days later, Law Firm C e-mailed Vaughn to set up interviews with John Doe 10 in their D.C. office. Id. at ¶ 96.

Sandrino wrote to Vaughn again in an e-mail dated July 1, 2010 that "I just spoke to Cathy and she mentioned that she might have an Antitrust lateral partner for [Law Firm C], so I hope that Robin's guy finishes his business plan soon." (Park Decl., Ex. 35.)

---

[7] See id. at 10, n. 5.

Lucas Group ultimately succeeded in placing John Doe 10 in the D.C. Office of Law Firm C, and set aside a commission for Sandrino in connection with that placement.  (Defs. Reply Stmt. of Facts ¶ 63); and (Resp. to Lucas Stmt. of Facts ¶ 100.)  MA did not submit an antitrust partner candidate for Law Firm C's D.C. office.  (Resp. to Lucas Stmt. of Facts ¶ 99.)

### B. John Doe 8

On April 18, 2010, Sandrino forwarded Vaughn an April 13 e-mail from her MA account in which she had submitted the candidacy of John Doe 8.  Attached to the e-mail were John Doe 8's resume and business plan bearing an MA stamp and identifying information.  (Defs. Reply Stmt. of Facts ¶ 64); and (Resp. to Lucas Stmt. of Facts ¶ 71.)  Vaughn used the same documents and information from Sandrino's e-mail to submit John Doe 8's candidacy through Lucas Group.  (Defs. Reply Stmt. of Facts ¶ 65); and (Resp. to Lucas Stmt. of Facts ¶ 73.)  Lucas Group ultimately succeeded in placing John Doe 8 and earned a commission, a portion of which was set aside for Sandrino. (Defs. Reply Stmt. of Facts ¶ 66); and (Resp. to Lucas Stmt. of Facts ¶ 80.)

### C. Disclosed Candidates

In addition to John Doe 8, during this same time period, Sandrino also disclosed to the Lucas Group through separate e-mails and other correspondences twelve candidates who were

10

reflected in MA's internal candidate lists.  (Defs. Reply Stmt. of Facts ¶ 69.)  The parties do not dispute that these disclosures occurred.  Id.

## V.   Sandrino Accepts a Position with the Lucas Group

In May 2010, the Lucas Group offered Sandrino a position with its Los Angeles legal recruiting division effective July 12, 2010.  (Resp. to Lucas Stmt. of Facts ¶ 51.)  On June 24, 2010, Sandrino executed and returned the Lucas Group Agreement in which she expressly stated that she was under no prior agreement prohibiting her from using or disclosing trade secrets or confidential and proprietary information.  Id. at ¶ 52.  At the time that she executed the Lucas Group Agreement, Sandrino did not notify MA of her actions.  (Defs. Reply Stmt. of Facts ¶ 73.)

## VI.   June 2010 to Filing of the Complaint

Following her execution of the Lucas Group Agreement, Sandrino continued to interact with both the Lucas Group and MA. Although the parties do not dispute that these interactions occurred, the parties disagree as to the impact that these subsequent actions had on the relationship between Sandrino and MA.

### A. Sandrino's Activity Log

On June 10, 2010, MA staff forwarded to Sandrino a 92-page document that contained the details of 77 candidates.  Id. at ¶

67.   This document (the "MA Log"), which was a version of a
companion log to MA's WinSearch internal tracking system, traced
only the candidates for whom Sandrino was providing recruiting
services.  Id. at ¶ 32; and (Resp. to Lucas Stmt. of Facts ¶ 56-
7.)  The MA Log was created at Sandrino's request and for her
convenience.  Id.

On the same day that she herself received the MA Log,
Sandrino forwarded the document as an e-mail attachment to
Vaughn.  (Defs. Reply Stmt. of Facts ¶ 67); (Resp. to Lucas
Stmt. of Facts ¶ 58.)  At no time did Sandrino seek or obtain
MA's permission to disclose the MA Log or any of its contents to
anyone outside of MA.  (Defs. Reply Stmt. of Facts ¶ 68.)[8]

### B. The Doe 1 Placement Payment

On July 1, 2010, Sandrino sent an e-mail to Michaelson
asking if MA had received the check for the Doe 1 placement.
(Aff. of Nader Mobargha, Esq., ("Mobargha Aff.") Ex. 16.)  On
July 2, 2010 at 6:07 a.m. Michaelson sent an e-mail to Sandrino
stating that Sandrino "[would] get the check on the payday after
we receive it, like always."  Id.  Also on July 2, 2010,
Michaelson deposited a check for $612,500 from Law Firm A for

---

[8] Although the parties do not dispute that Sandrino sent Vaughn the log, they
do dispute whether Vaughn ever viewed it.  Relying solely on Vaughn's
deposition testimony, the Lucas Counterclaim Defendants argue that Vaughn
never opened the attachment. (Defs. Reply Stmt. Of Facts ¶ 61.)  Citing
circumstantial evidence, the Michaelson Defendants question Vaughn's
credibility and dispute this contention.  Id.

Doe 1's placement in MA's bank account.  (Resp. to Sandrino
Stmt. of Facts ¶ 19.)

### C. *Sandrino's Termination and Filing of the Complaint*

On July 4, 2010, Michaelson fired Sandrino in an e-mail.
(Resp. to Sandrino Stmt. of Facts ¶ 22.)  On October 20, 2010,
Sandrino filed the instant action.[9]

### STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).
"The role of the court in deciding a motion for summary judgment
'is not to resolve disputed issues of fact but to assess whether
there are any factual issues to be tried, while resolving
ambiguities and drawing reasonable inferences against the moving
party.'"  Wilson v. Northwestern Mut. Ins. Co., 625 F.3d 54, 60
(2d Cir.2010) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9,
11 (2d Cir.1986)).  Although all reasonable inferences and
ambiguities must be drawn or resolved in favor of the nonmoving
party, the moving party bears the initial burden of
"demonstrat[ing] the absence of a genuine issue of material
fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
"Unless the nonmoving party offers some hard evidence showing

---

[9] As of the date of the parties' pending motions, Sandrino remained employed
by the Lucas Group.  (Defs. Reply Stmt. of Facts ¶ 2.)

that its version of the events is not wholly fanciful, summary judgment is granted to the moving party." Miner v. Clinton County, New York, 541 F.3d 464, 471 (2d Cir. 2008) (internal citation omitted).

DISCUSSION

Sandrino, the Michaelson Defendants, and the Lucas Counterclaim Defendants have each filed motions for summary judgment.  In her motion, Sandrino argues that she should be granted summary judgment on her breach of contract claim against the Michaelson Defendants, and that the Michaelson Defendants' counterclaims against her should be dismissed.  The Michaelson Defendants' motion argues instead that the Complaint should be dismissed in its entirety, and that partial summary judgment should be granted against Sandrino for liability on the Michaelson Defendants' counterclaims.  Separate from Sandrino and the Michaelson Defendants' claims against each other, the Lucas Counterclaim Defendants's motion argues that the Court should dismiss all of the Michaelson Defendants' counterclaims against the Lucas Counterclaim Defendants.

## I.  Sandrino's Claims

The Complaint brings two causes of action: (1) breach of contract; and (2) a violation of New York State Labor Law.  Both Sandrino and the Michaelson Defendants have moved pursuant to

14

Rule 56 for summary judgment on the Complaint's contract claim.

In addition, the Michaelson Defendants have also moved for an

order dismissing the New York State Labor Law claim.

### A. *Breach of Contract Claim*

#### 1. Terms of the Agreement

In support of their respective motions, neither party has

argued that the language of the Agreement is ambiguous.

Instead, both parties argue that the Agreement's clear terms

should lead the Court to render judgment in their favor.  "The

construction of an unambiguous contract is appropriate for

resolution on summary judgment," MTA Bus Non-Union Employees

Rank and File Comm. ex rel. Simon v. Metro. Transp. Auth., No.

11 Civ. 4493, 2012 WL 4782736, at * 6 (S.D.N.Y. Sept. 25, 2012),

and the Court now turns to the contract terms.

As an initial matter, the parties disagree as to the plain

meaning of Section 2.4, which describes how "[t]he Company shall

pay to the Contractor commission compensation ("Commissions") .

. . ."[10]  Sandrino argues that the relevant event for determining

under Section 2.4 whether "the Term is still ongoing," is

whether MA has received revenue from the law firm client.  The

Michaelson Defendants argue instead that the relevant event is

not the receipt of revenue by MA, but the payment of a

---

[10] The Court refers to specific sections of the Agreement by the paragraph
numbers listed therein.  See (Park Decl., Ex. 5.)

Commission to Sandrino.  Having reviewed the Agreement, the
Court finds that Sandrino's reading, and not that of the
Michaelson Defendants, is consistent with the clear and
unambiguous contract terms.

The plain language of Section 2.4 distinguishes between
Commissions received by MA during Sandrino's engagement and
Commissions received after she is no longer engaged with MA.
The first bullet under Section 2.4 defines "Commissions" as
"Fifty percent (50%) of the revenue received by the Company in
connection with the placement of a Candidate with a client of
the Company ("Client") . . . ."  (Park Decl., Ex. 5, ¶ 2.4),
first bullet (emphasis added).  The first bullet therefore
establishes that the defining event governing Section 2.4 is the
receipt of revenue by MA.  Indeed, the second and third bullets
are not reasonably susceptible to any alternative reading,
including that advocated for by the Michaelson Defendants.  Any
reading of Section 2.4 that hinges on when payment is made to
Sandrino would make the terms of the second and third bullets
circular.  Since the second and third bullets themselves define
when payment "shall become due and owing" to Sandrino, payment
to Sandrino cannot be the event which determines whether the
second or third bullet of the section applies.

In arriving at its reading of the Agreement, the Court has
found unpersuasive the Michaelson Defendants' arguments that

16

such a reading leaves MA unprotected from the risk of a
confidentiality breach and/or of a law firm ultimately
rescinding payment.  These arguments disregard the plain
language of Sections 2.5 and 4, which respectively govern: (1)
Sandrino's obligations to repay MA when MA must refund any
portion of revenue received to a law firm; and (2) both
Sandrino's confidentiality obligations and MA's remedies in the
event of a breach.  Although the Michaelson Defendants further
argue that there is no rational basis for distinguishing between
a Commission received by MA prior to Sandrino's termination from
one received afterwards, and that confidentiality obligations
must be satisfied in order for Sandrino to be entitled to any
Commission received by MA while her engagement was ongoing,
(Memorandum of Law in Supp. of Defs.and Countercl. Pl.'s Mot.
for Summ. J. Dismissing the Compl. and for Partial Sum. J.
Against Sandrino ("Defs. Summ. J. Mem.") 20-21), the Agreement's
clear terms dictate otherwise.[11]

### 2. Sandrino's Engagement with MA

Although the parties do not dispute that MA sent a
severance letter to Sandrino on July 4, 2010, in support of
their motion for summary judgment, the Michaelson Defendants

---

[11] The question of whether the Agreement would be ambiguous with respect to a
payment received after Sandrino's termination does not impact the Court's
present inquiry.  See Morgan Stanley Group Inc. v. New England Ins. Co., 225
F.3d 270, 278 (2d Cir. 2000) ("[A] contract may be ambiguous when applied to
one set of facts but not another [. . .] ambiguity is detected claim by
claim.")

argue that Sandrino unilaterally terminated the Agreement on
June 24, 2010, when she executed the Lucas Group Agreement.
Since the Lucas Group Agreement contained a non-compete
provision, the Michaelson Defendants argue that Sandrino was
precluded from providing any recruiting services for MA upon
signing the Lucas Group Agreement.

The Court disagrees with the Michaelson Defendants' reading
of the agreements.  While Sandrino's simultaneous engagement
with MA may have constituted her breach of the Lucas Group
Agreement's exclusivity terms, it does not follow that the
Agreement with MA was unilaterally terminated as a result of
that breach.  The Court accordingly finds that Sandrino's
engagement with MA was terminated on July 2, 2010, when she was
terminated by the severance letter from MA.

### 3. Faithless Agent

In addition to their contract interpretation arguments, the
Michaelson Defendants also argue that Sandrino's claim for
breach of contract is foreclosed by law under New York's
"faithless agent" doctrine.  Under the faithless agent doctrine,
"[o]ne who owes a duty of fidelity to a principal and who is
faithless in the performance of his services is generally
disentitled to recover his compensation, whether commissions or
salary."  Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928
(1977).  Even if the Court accepts the Michaelson Defendants'

contention that Sandrino owed MA a duty of loyalty as its agent, the Court finds that Sandrino's recovery for her breach of contract claim would not be precluded by the faithless agent doctrine.

The Second Circuit has held that a disloyal employee retains compensation earned in connection with the specific tasks as to which she was loyal where: "(1) the parties had agreed that the agent will be paid on a task-by-task basis (e.g., a commission on each sale arranged by the agent), (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks neither tainted nor interfered with the completion of the tasks as to which the agent was loyal." Phansalkar v. Weinroth & Co., L.P., 344 F.3d 184, 205 (2d Cir. 2003) (internal citations omitted). "Since forfeiture arises upon misconduct and disloyalty which substantially affect the contract of employment . . . it follows that obligations that are unrelated to the disloyalty would not be affected by it." G.K. Alan Assoc., Inc. v. Lazzari, 840 N.Y.S.2d 378, 386 (App. Div. 2007) (internal citations omitted). To the extent that some New York courts have adopted an alternative rule "requiring forfeiture by the agent of all salary and other compensation after his first faithless act," "these decisions have involved either an employment situation which, by definition, involves only a

single agency relationship, or an agency that was limited to a single purpose. . . ."  Id.

In the instant action, the Court finds that, under the faithless agent doctrine as established in the Second Circuit's decision in Phansalkar, Sandrino would not have to forfeit the Commission associated with the Doe 1 placement.  On the first prong of the analysis, although Sandrino received her compensation in the form of a bi-weekly payment, the Agreement specifically states that this payment was a "draw against future Commissions."  (Park Decl., Ex. 5, ¶ 2.2.)  The Court accordingly finds that the parties agreed that Sandrino would be compensated on a task-by-task commission basis.  With respect to the second and third prongs of Phansalkar, the Michaelson Defendants argue that Sandrino fails to satisfy these prongs because: (1) she used her personal e-mail address to correspond with Law Firm A; (2) she referred to Michaelson as a "crazy person" in an April 27, 2010 e-mail to the head of Law Firm A; and (3) she diverted a candidate for Law Firm A from MA to the Lucas Group on April 22, 2010.  (Defs. Summ. J. 30-33.)  The Court finds that, even accepting the Michaelson Defendants' version of the facts, as a matter of law, these actions do not warrant forfeiture of the Doe 1 placement Commission.  While the Michaelson Defendants submit that Sandrino was not forthcoming about the use of her personal e-mail address, and that she used

this address to prevent Michaelson from reading her e-mail, they have submitted no evidence to support any claim that this use of an alternative e-mail address constituted misconduct with respect to the Doe 1 placement.  The other two acts of disloyalty relied upon by the Michaelson Defendants occurred after the undisputed date on which the parties agree that John Doe 1 was successfully placed, (Resp. to Sandrino Stmt. of Facts ¶ 13), and the Court accordingly finds that neither act tainted nor interfered with the Doe 1 placement.

    1. Conclusion

    Since it is undisputed that MA received payment from Law Firm A for the Doe 1 placement by July 2, 2010, two days before Sandrino's termination, the Court finds that Sandrino's Commission for the Doe 1 placement became due and owing, and should have been paid pursuant to the Agreement "in the pay period immediately after such revenue is actually received by [MA]," Park Decl., Ex. 5, ¶ 2.4, bullet 2.  Based on the Court's consideration of the faithless agent doctrine as established by the Second Circuit in Phansalkar, the Court finds that Sandrino's Commission for the Doe 1 placement is not subject to forfeiture.  For these reasons, the Court grants Sandrino's

motion for summary judgment with respect to her breach of contract claim.[12]

### B. Violation of New York State Labor Law

The Michaelson Defendants argue that the Complaint's claims for violation of New York State Labor Law must be dismissed because "Sandrino's insistence on her status as an independent contractor is fatal to her New York Labor Law claim," (Defs. Summ. J. Mem. 23-24,) because that statute excludes independent contractors from its protection.  See Bhanti v. Brookhaven Mem'l Hosp. Med. Ctr., Inc., 687 N.Y.S.2d 667, 669, (App. Div. 1999) ("Although the definition of employee is broad, independent contractors are not included.")

The test for whether a person is deemed to be an independent contractor for purposes of New York Labor Law does not depend, however, on what the person has labeled themselves. Instead, the analysis is a question of fact which hinges on whether "the employer exercises either control over the results produced or over the means used to achieve the results."  Id. Such a factual inquiry is not ripe for summary judgment, and the

---

[12] Sandrino argues in her motion for summary judgment that she is entitled to attorneys' fees because "Defendants' bad faith breach of their contractual obligation entitles [her] to reimbursement of her attorney's fees for forcing her to bring an action to recover a commission that Defendants have repeatedly admitted they owe her."  (Pl. Gloria Sandrino's Mem. of Law in Supp. of Her Mot. for Summ. J. ("Pl.'s Summ. J. Mem.") 18.)  The Court finds, however, that the Michaelson Defendants have not acted in bad faith, vexatiously, wantonly, or for oppressive reasons such that an award of attorneys' fees is not warranted.

Court accordingly denies the Michaelson Defendants' motion as to this claim.

## II.   Michaelson Defendants' Counterclaims against Sandrino

### A. Breach of Contract and Breach of Loyalty

With respect to the Michaelson Defendants' counterclaims for breach of contract and breach of loyalty against Sandrino, the Court finds that these claims involve genuine disputes as to material fact, such that neither party is entitled to judgment as a matter of law.  The Court therefore denies both Sandrino's and the Michaelson Defendants' motions for summary judgment as to these claims.

### B. Unjust Enrichment

"Under New York law, a claim for unjust enrichment is unavailable for conduct that might also form the basis for an action for breach of contract."  Swartz v. Tyco Int'l Ltd., No. 12 Civ. 4060, 2012 WL 5198374, at *3 (S.D.N.Y. Oct. 22, 2012) (citing Whitman Realty Group, Inc. v. Galano, 838 N.Y.S.2d 585, 588 (App. Div. 2007)).  The reason for this is that "[u]njust enrichment is designed to prevent one person who has obtained a benefit from another without ever entering into a contract with that person from unjustly enriching himself at the other person's expense."  Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 984 (S.D.N.Y. 1989).

23

The Court finds that the Michaelson Defendants' claim for unjust enrichment merely alleges the same conduct that forms the basis of their claim for breach of the Agreement.  The Court therefore finds that the Michaelson Defendants are precluded from pursuing their claim for unjust enrichment as a matter of New York law.

### C. *Misappropriation and Unfair Competition*

Sandrino argues that the Michaelson Defendants' counterclaims against her for misappropriation and unfair competition must be dismissed because they are duplicative of the Michaelson Defendants' breach of contract claim.  Having reviewed the Amended Answer and Counterclaim, the Court agrees with Sandrino.  In support of these claims, the Michaelson Defendants have merely reiterated the allegations which underlie their breach of contract claim.  "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated," Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 N.Y.2d 382, 389 (N.Y. 1987), and the Michaelson Defendants have not alleged any duty "extraneous to, and not constituting elements of, the contract," Id.  The Court therefore grants Sandrino's motion with respect to these claims and dismisses the Michaelson Defendants' counterclaims against Sandrino for misappropriation and unfair competition.

III.   **Michaelson Defendants' Counterclaims against the Lucas Counterclaim Defendants**

The Lucas Counterclaim Defendants have moved for summary judgment on all four of the counterclaims alleged against them.

### A. *Tortious Interference with Contract*

The Lucas Counterclaim Defendants argue that the Michaelson Defendants claim for tortious interference of contract must fail because the Lucas Parties lacked knowledge of the Agreement and did not intentionally induce material breach.  The Court finds, however, that there are genuine disputes as to material facts with respect to both of these issues.  The Court therefore denies the Lucas Counterclaim Defendants' motion with respect to this claim.

### B. *Misappropriation of Trade Secrets and Proprietary Business Information*

As an initial argument, the Lucas Counterclaim Defendants argue that the Michaelson Defendants' claims for misappropriation of trade secrets and unfair competition should be dismissed because the information they actually received from Sandrino cannot be considered either a trade secret or proprietary.  Although the Lucas Counterclaim Defendants concede that the information in the MA Log constituted trade secrets, they argue that they never opened the log.  With respect to the remaining information shared by Sandrino, the Lucas Counterclaim Defendants argue that this material cannot be considered a trade

secret because: (1) it was not in continuous use in the

operation of MA's business; (2) MA could not control either

candidates or law firms from disclosing the information

themselves; and (3) MA did not take sufficient precautions to

protect the information.  The Lucas Counterclaim Defendants

further argue that the information cannot even be considered

proprietary because MA lacked exclusive control over the

information.

     The Court finds these arguments unavailing.  Even setting

aside the information contained in the MA Log, the Court finds

that the MA client information that Sandrino shared with the

Lucas Counterclaim Defendants constituted trade secrets.  The

identity of customers can be considered a trade secret when such

information is not readily ascertainable to the public and

requires personal solicitation to develop.  See FMC Corp. v.

Taiwan Tainan Giant Indus. Co., Ltd., 730 F.2d 61, 63 (2d Cir.

1984) ("[C]ustomer lists are trade secrets only if the names on

the list are not readily ascertainable from sources outside an

employer's business. . . .") (internal citations omitted).

Given that law firm partners are unlikely to openly publicize

their interest in pursuing a position at another firm, the mere

identification of a candidate as a client of MA's is information

that has confidential value for MA's competitors.  See Webcraft

Technologies, Inc. v. McCaw, 674 F. Supp. 1039, 1045 (S.D.N.Y.

1987) ("[T]he confidential value of Webcraft's customer list
lies not only in its identification of someone's customers for
printing, but more importantly, especially for competitors . . .
in that it identifies customers who have learned and have bought
the benefits of in-line finishing.")  That MA did not take
certain steps to further protect this information does not
change the Court's analysis.  "Absolute secrecy . . . is not
required, [t]he rule is only that a substantial element of
secrecy must exist and this means so much that except by use of
improper means, there would be difficulty in acquiring the
information."  Thin Film Lab, Inc. v. Comito, 218 F. Supp. 2d
513, 520 (S.D.N.Y. 2002) (internal citations omitted).  Having
required recruiters to sign nondisclosure agreements, trained
all new employees on the need to protect confidential
information, limited administrative staff's access to documents,
and instituted password protections, the Court finds that MA
took steps to ensure that, except by use of improper means,
there would be difficulty in acquiring the information.

As an additional argument, the Lucas Counterclaim
Defendants argue that, even if the information taken from MA was
a trade secret and proprietary, the claims should be dismissed
because the Lucas Counterclaim Defendants did not use improper
means to acquire that information.  As with the Michaelson
Defendants' counterclaim for tortious interference, the Court

finds that there are disputed issues of fact with respect to
this issue. For all of these reasons, the Court denies the
Lucas Counterclaim Defendants' motion for summary judgment as to
these claims.

### C. Unjust Enrichment

The Lucas Counterclaim Defendants argue that the Michaelson
Defendants' claim for unjust enrichment must be dismissed
because MA's damages from the placements of John Does 8 and 10
are uncertain. The Court finds these arguments unavailing, as
the focus of the court's inquiry on a claim for unjust
enrichment is not the plaintiff's loss but the defendant's gain.

"Under New York state law, the basic elements of an unjust
enrichment claim are: 1) defendant was enriched; 2) such
enrichment was at the expense of the plaintiff; and 3) the
circumstances were such that in equity and good conscience the
defendant should make restitution." Malmsteen v. Berdon, LLP,
477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007). In its consideration
of whether the third element of a claim has been satisfied, the
Court considers the general principle that "[t]he remedial
purposes of damages and of restitution-in this case,
disgorgement of unjust gains-also differ." U.S. ex rel. Taylor
v. Gabelli, No. 03 Civ 8762, 2005 WL 2978921, at *4 (S.D.N.Y.
Nov. 4, 2005). Whereas "[d]amages typically focus on the
plaintiff and provide 'make whole,' compensatory, monetary

relief; restitution, by contrast, concentrates on the defendant-preventing unjust enrichment, disgorging wrongfully held gains, and restoring them to the plaintiff." Id. See also Restatement (First) of Restitution § 1 (2012) ("There are situations . . . a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust.  In such cases, the defendant may be under a duty to give the plaintiff the amount by which he has been enriched.")

The Court therefore finds that there are genuine issues of disputed fact with respect to the Michaelson Defendants' counterclaim against the Lucas Counterclaim Defendants for unjust enrichment.

## CONCLUSION

The Court **GRANTS** Sandrino's motion for summary judgment on her breach of contract claim and awards her the $306,250 commission she is entitled to, plus interest.  The Court also **GRANTS** Sandrino's motion for summary judgment as to the Michaelson Defendants' counterclaims for unjust enrichment, misappropriation, and unfair competition; these claims are accordingly dismissed.  The Court **DENIES** Sandrino's motion for summary judgment as to the Michaelson Defendants' counterclaims for breach of contract and breach of loyalty.  The Court **DENIES**

29

the Michaelson Defendants' motion for summary judgment, and

**DENIES** the Lucas Counterclaim Defendants' motion for summary

judgment.

The Clerk of the Court is directed to terminate motions #

73, 74, and 75 from the ECF docket.

The parties are directed to submit a proposed Joint

Pretrial Order by December 17, 2012.

**SO ORDERED:**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           November 19, 2012

30